.

FILED & ENTERED

MAR 18 2026

CLERK U.S. BANKRUPTCY COURT
Central District of California
BY Cetulio    DEPUTY CLERK

# UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA

### SAN FERNANDO VALLEY DIVISION

| | |
|---|---|
| In re:<br><br>Hillcrest Ventures, LLC,<br><br>Debtor in Possession. | Case No.: 1:25-bk-11472-MB<br><br>Chapter 11<br><br>**MEMORANDUM OF DECISION RE: ROYAL BUSINESS BANK'S MOTION FOR RELIEF FROM THE AUTOMATIC STAY**<br><br>Evidentiary Hearing<br><br>Date:　February 17–19, 2026<br>Place:　Courtroom 303<br>　　　　21041 Burbank Blvd.,<br>　　　　Woodland Hills, CA 91367 |

## I.    INTRODUCTION

This case concerns a debtor whose business is redeveloping an office building located in Inglewood, California into a luxury apartment complex, entertainment venue, and retail hub. Prepetition, the debtor defaulted on its construction loan and the project remains incomplete. Postpetition, the bank moved for relief from the automatic stay under 11 U.S.C. §§ 362(d)(1) and (d)(2). The Court held an evidentiary hearing on the bank's motion, and it is now ripe for decision.

After weighing the parties' competing appraisals and noting issues with each, the Court determines that the property's as-is fair market value is $31,890,000—the midway between the two appraisals.  The Court finds that the bank's secured claim was slightly oversecured on the petition date,

but is now undersecured, as a result of the accrual of postpetition interest under Bankruptcy Code section 506(b).

Accordingly, the Court will grant relief under section 362(d)(1), finding that no equity cushion exists and that the debtor is unable to afford adequate protection payments.  Further, the Court will grant relief under section 362(d)(2), finding that the debtor has no equity in the property and that the debtor has failed to meet its burden to show the prospect of a successful reorganization within a reasonable amount of time.  The Court will decline to waive the 14-day stay applicable under Federal Rule of Bankruptcy Procedure 4001(a)(3).

This Memorandum constitutes the Court's findings of fact and conclusions of law for purposes of Federal Rule of Bankruptcy Procedure 7052, which is made applicable to the motion pursuant to Federal Rule of Bankruptcy Procedure 9014.  The Court will enter a separate order effectuating these findings and conclusions.

## II.  FACTUAL AND PROCEDURAL BACKGROUND

Hillcrest Ventures LLC (the "Debtor") is the debtor in the above-captioned chapter 11 case.  The Debtor is represented by Raymond H. Aver of the Law Offices of Raymond H. Aver, APC.  Dkt. 57.[1] The Debtor's co-managers are Hilldale Group, LLC and Forbix Inglewood Venture, LLC.  Dkt. 60 at 23 (¶ 1), 30 (¶ 1).  Brian R. Massie is the manager of Hilldale Group, LLC, and Emil Khodorkovsky is the manager of Forbix Inglewood Venture, LLC.  *Id*.  The Debtor's construction lender is Royal Business Bank (the "Bank").  The Bank is represented in this case by Mia S. Blackler and Maggie Cardasis of Lubin Olson.

**A.  The Properties**

The Debtor owns two parcels of real property located at 336 East Hillcrest Boulevard (the "Main Property") and 324 East Hillcrest Boulevard (the "Support Property") in Inglewood, California 90301. Dkt. 18 at 3–4 (schedule A/B).  The Main Property is improved with the structural remnants of an office building.  The Debtor's business is to convert the former office building into a 6-story building with 65

---

[1] All facts herein are derived from declarations of the witnesses previously filed with the Court and deemed admitted, live testimony adduced at trial and all admitted trial exhibits.  The Court also takes judicial notice of all papers filed in this case. *See O'Rourke v. Seaboard Sur. Co. (In re E.R. Fegert, Inc.)*, 887 F.2d 955, 957-58 (9th Cir. 1989) (holding that appellate courts can take judicial notice of bankruptcy docket, even if the parties did not include the underlying records in the appellate record); *Atwood v. Chase Manhattan Mortg. Co. (In re Atwood)*, 293 B.R. 227, 233 n.9 (B.A.P. 9th Cir. 2003) (same).

Class A apartment units.  The conversion was substantially incomplete when the Debtor ran out of funds and ceased construction sometime in 2024.  The Debtor currently leases 100 square feet of the Main Property's roof to T-Mobile USA, Inc. for a cell tower.  Dkt. 32 at 3.  That lease generates $3,634.61 per month. *See* Dkt. 38 at 8; Dkt. 91 at 13.  This is the only income currently generated by the Debtor.

The Support Property is improved by a single-story commercial building that the Debtor is currently using "for office space and storage."  Dkt. 60 at 23–24 (¶ 5.b).  At trial, Massie testified that it is "fully furnished" and that the Debtor intends to use it as the management office — "a place where tenants would go to sign agreements until the project is completed…."  Feb. 19 Tr. at 47.

In addition to real property, the Debtor owns construction materials and food service equipment that it purchased for installation at the Main Property (the "Materials").  Dkt. 60 at 24 (¶ 6.a); Ex. A (list of construction materials and their locations); Ex. B (list of food service equipment and their purchase prices).  Massie testified that the Materials are located "either onsite or offside held by one of the subcontractors at their location, or … physically onsite either at the [Support Property], in the shipping containers in the church parking lot,[2] or on the [Main P]roperty itself."  Feb. 19 Tr. at 83–84.

Massie also testified that the Materials are worth, in the aggregate, "in excess of $5.2 million."  Dkt. 60 at 24 (¶ 6.a); Feb. 19 Tr. at 86.  He based this value on how much the Debtor paid to purchase the Materials "a few years ago," of which Massie personally approved the acquisition.  Feb. 19 Tr. at 88.  Massie further testified that, in his opinion, the Materials are worth more than the prices at which the Debtor purchased them because "there has been hyperinflation" in the market for the Materials.  *Id*. at 89.  However, Massie acknowledged that he has not repriced the Materials.  *Id*.

**B.**     **The Bank's Loan to the Debtor**

On July 30, 2021, the Bank made a construction loan evidenced by a "Secured Note" to the Debtor in the original principal amount of $32,000,000.  Dkt. 48 at 14 (¶ 7), 26–31 (the "Loan").  The Loan had a maturity date of February 10, 2023 and a variable interest rate.  *Id*. at 26–27.  The Bank obtained a guaranty of the Loan from Massie and Khodorkovsky.  *Id*. at 15 (¶ 12), 81–90 (guaranty

---

[2] The Debtor leases 26 of the 36 spaces in the nearby parking lot for the First United Methodist Church of Inglewood.  Dkt. 32 at 2 (amended schedule G).  The Debtor uses that leased space to park 10 shipping containers, which the Debtor leases from Allied Storage Containers.  *See id*.

dated July 30, 2021).  The Loan is secured by a first-priority "Deed of Trust, Assignment of Leases and Rents, Fixture Filing and Security Agreement (Construction)"  *Id*. at 14–15 (¶ 11), 56–79 (the "Deed of Trust").  On August 6, 2021, the Bank recorded the Deed of Trust against the Main Property.  *Id*. at 55.[3]

The Deed of Trust also provides the Bank with a blanket lien in all of the Debtor's then-existing and after-acquired tangible and intangible personal property in accordance with Article 9 of the Uniform Commercial Code ("UCC").  *Id*. at 56, 62.  The record does not contain any copy of a UCC-1 Form financing statement perfecting such blanket lien, and a postpetition query using the terms "336 Hillcrest" and "Hillcrest Ventures" the California Secretary of State's UCC database returned no such results.[4]

Between March 22, 2023, and August 26, 2024, the Debtor and the Bank executed five successive "Change in Terms Agreements," the last of which states that "[t]he outstanding principal balance under the Note is $26,394,745.08" and extends the Loan's maturity date to February 10, 2025.  Ex. 2 at 0037.

**C.    The Default**

The Bank asserts that, the Debtor defaulted on the Loan by, among other bases, failing to pay the outstanding balance on the February 10, 2025 maturity date and failing to pay property taxes on the Main Property.  Dkt. 48 at 15–16 (¶ 14).  On February 14, 2025, the Bank recorded against the Main Property a "Notice of Default and Election to Sell Under Deed of Trust."  Ex. 8 at 0001–03.

On May 15, 2025, the Bank recorded against the Main Property a "Notice of Trustee's Sale," scheduling a foreclosure sale for June 17, 2025.  *Id*. at 0004–07.  The foreclosure sale was postponed from time to time throughout the summer of 2025 to allow the Debtor to pursue sale or refinance efforts.  Dkt. 48 at 6 (¶ 18).  During that summer, the Bank's deputy chief credit officer, Robert Ross, and Khodorkovsky "had many conversations[,] both together and separately with third parties … about a potential refinance loan, … note sale, or short sale of the [Main] Property…."  *Id*.

---

[3] It does not appear that the Support Property is part of the Bank's collateral.

[4] *See* California Secretary of State, *UCC Search*, https://bizfileonline.sos.ca.gov/search/ucc.  The Court may take judicial notice of public records from the California Secretary of State's website.  *See* Fed. R. Evid. 201; *Gerritsen v. Warner Bros. Ent., Inc.*, 112 F. Supp. 3d 1011, 1033-34 (C.D. Cal. 2015) (taking judicial notice of business entity profile from the California Secretary of State's website); *L'Garde, Inc. v. Raytheon Space & Airborne Sys.*, 805 F.Supp.2d 932, 937-38 (C.D. Cal. 2011) (same).

On August 5, 2025, the Bank filed a civil complaint against the Debtor, Massie and Khodorkovsky in the Los Angeles Superior Court. *Id*. at 17–18 (¶ 19); *see* LASC Case No. 25STCV23075 (the "State Court Action"). On August 13, 2025, the Bank filed an *ex parte* motion for the appointment of a receiver in the State Court Action. *Id*.

**D.     The Bankruptcy Case**

On the same day that the Bank filed its receivership motion, the Debtor filed a chapter 11 petition, staying the State Court Action (the "Petition Date"). *See* Dkt. 1; 11 U.S.C. § 362(a).[5]

**<u>Cash Collateral</u>**

On December 12, 2025, the Bank, the Debtor and Forbix stipulated to the Debtor's use of cash collateral. Dkt. 75 at 17-29 (stipulation). After an emergency hearing and a subsequent final hearing, the Court approved the parties' stipulation. Dkt. 94. The Debtor's authorization to use the Bank's cash collateral expired on February 28, 2026, and no party has filed papers regarding the Debtor's use of cash collateral since then.

**<u>The DDA Account</u>**

Prepetition, the Debtor maintained a demand deposit account with the Bank (the "DDA Account"). On the Petition Date, the DDA Account had a balance of $238,105.98, and the parties disputed ownership of those funds. On January 15, 2026, the Bank and the Debtor filed a stipulation whereby the Debtor withdrew any objection to the Bank's ownership of the funds. Dkt. 93. The stipulation further authorized the Bank to use $164,321.26 of the funds in the DDA Account to pay for premiums the Debtor owed on its property insurance and general and excess liability insurance policies for the Main Property. *Id*. On February 5, 2025, the Court approved the stipulation, and the Bank paid the premiums. Dkt. 110.

**<u>The Bank's Proof of Claim</u>**

On November 24, 2025, the Bank filed a proof of claim against the Debtor, asserting a secured claim in the amount of $31,238,526.60 as of the Petition Date. Claim No. 8-1. The Bank calculates its secured claim as follows:

---

[5] Unless otherwise stated herein, all statutory references are to sections of title 11 of the United States Code (the "Bankruptcy Code").

Principal balance due at Petition Date ........................................................$26,394,754.08

Accrued nondefault interest (June 28, 2021 to Aug. 13, 2025) ......................$2,463,509.54

Accrued default interest (Feb. 14, 2025 to Aug. 13, 2025, *see* Note § 6).........$667,201.08

Late charges (5% of the principal owing at maturity, *see* Note § 3) ..............$1,435,075.24

Fees, expenses and charges:

    Advanced insurance and taxes ...........................................................$174,862.33

    Appraisal and inspection/cost study fees ................................................$23,000.00

    Attorney's fees .................................................................................$45,385.00

    Trustee fees (as of 7/21/25).................................................................$34,749.35

TOTAL ........................................................................................$31,238,526.60

*Id.*

The proof of claim asserts that interest, attorneys fees and costs continue to accrue on the debt after the Petition Date "as provided under applicable law."  Claim No. 8-1 at 4.   At trial, the Bank offered uncontroverted testimony that postpetition interest accrues at a rate of $7,331 per diem.  Feb. 18 Tr. at 58.  According to the Bank's deputy chief credit officer, this rate is inclusive of default interest. *Id.*

**The Motion**

On November 10, 2025, the Bank filed a "Motion for Relief from the Automatic Stay Under 11 U.S.C. § 362."  Dkt. 48 (the "Motion").  In the Motion, the Bank seeks relief from the stay pursuant to §§ 362(d)(1) and (d)(2) to foreclose upon and seek appointment of a receiver of the Main Property pursuant to the Deed of Trust.  *Id*. at 5, 147.  In the alternative, the Bank requests that the Court condition the stay on the Debtor providing adequate protection.  *Id*.  In support of the Motion, the Bank offered the declaration of Robert Ross, deputy chief credit officer at the Bank.  *Id*. at 6–146.

On November 20, 2025, the Debtor filed an opposition to the Motion.  Dkt. 60 (the "Opposition").  In support of the Opposition, the Debtor offered the declarations of Massie and Khodorkovsky.  Dkt. 60 at 23–35 (declarations); Dkt. 60-1 at 1–37 (exhibits to declarations).  On November 25, 2025, the Bank filed a reply to the Opposition.  Dkt. 63.

**Pretrial Proceedings**

On December 2, 2025, at 10:00 a.m., the Court held a preliminary hearing on the Motion. On December 5, 2025, at 2:00 p.m., the Court held a continued hearing on the Motion for the purpose of setting an evidentiary hearing on the Motion and related deadlines. On December 17, 2025, the Court entered an order scheduling the evidentiary hearing and related pretrial deadlines. Dkt. 73. The Court later extended certain deadlines set forth in the scheduling order regarding expert witness reports and depositions. *See* Dkt. 108.

On February 13, 2026, the Bank filed a motion in limine to exclude testimony from the Debtor's proffered expert witness, Joy Kwong. Dkt. 115 ("MIL No. 1"); *see also* Dkt. 116 (declaration in support). In MIL No. 1, the Bank contended that Kwong did not timely produce responsive documents on which she based her expert opinion. *See id*. 5-6. The Bank also argued that Kwong spoliated a text message thread between herself and Khodorkovsky, and that the Court should draw an adverse inference therefrom. *See id*. at 6. Further, the Bank argued that it was put at a disadvantage because the Debtor declined to file a trial brief and that the Court should, for that reason, summarily grant relief from the automatic stay. *See* Dkt. 118 (supplement to MIL No. 1).

The Court denied MIL No. 1. First, as the Court explained on the record at the evidentiary hearing, the Kwong Appraisal was timely exchanged under the parties' revised stipulation. Feb. 17 Tr. at 32–35. The documents that Kwong relied on were produced six days later, which did put the Bank at some disadvantage and certainly was an inconvenience to the Bank. *Id*. at 33–34. But the Court had afforded the parties' counsel the opportunity to craft a stipulation regarding all pretrial procedures nearly two months before the trial. The parties' stipulation did not require either party to produce the documents on which its expert witness relied—on any date. *Id*. at 34. Thus, the Court could not conclude that the timing of the production of those documents by the Debtor's expert was any sort of misconduct. Further, the Court found that the wholesale exclusion of Kwong's testimony would not be an appropriate remedy under the circumstances. *Id*.

Second, the Court was not persuaded that the deletion of certain text messages by Kwong was intentional, or that the wholesale exclusion of her testimony was an appropriate remedy for the loss of

7

those messages.  The Court was satisfied that the Bank could explore the circumstances and substance of those messages at trial.

Third, the Court was not persuaded that the Debtor's failure to file a trial brief constituted misconduct by the Debtor, let alone the sort of misconduct that would justify summarily granting the Bank relief from the automatic stay.  As discussed at the evidentiary hearing, the Court held that even if sanctionable, the appropriate sanction for the Debtor's failure to file a trial brief was a finding that its opportunity to do so had been forfeited.  Feb. 17 Tr. at 32–33.

**The Evidentiary Hearing**

On February 17–19, 2026, the Court held an evidentiary hearing on the Motion.  Raymond H. Aver of the Law Offices of Raymond H. Aver, APC appeared on behalf of the Debtor.  Mia S. Blackler and Margaret T. Cardasis of Lubin Olson & Niewiadomski LLP appeared on behalf of the Bank.

On February 18, 2026, the Bank filed a second motion in limine, this time to exclude certain of the Debtor's proposed trial exhibits, which the Bank contended were not timely disclosed.  Dkt. 122 ("MIL No. 2").  After oral argument, the Court granted MIL No. 2.  Feb. 18 Tr. at 94.

Having considered the parties' papers filed in support of and in opposition to the Motion, oral arguments, the testimony at trial, as well as other pleadings and papers filed in the case, the Court now finds and concludes as follows.

### III.   JURISDICTION, ADJUDICATIVE AUTHORITY & VENUE

The Court has jurisdiction over the Motion pursuant to 28 U.S.C. § 1334(b), because the Motion arises under the Bankruptcy Code, namely under § 362(d).  As such, the Motion pertains to statutorily and constitutionally core matters over which this Court has the adjudicative authority to enter final orders.  *Wellness Int'l Network, Ltd. v. Sharif*, 575 U.S. 665, 670–71 (2015); 28 U.S.C. § 157(b)(1).  The Court also finds that venue is proper under 28 U.S.C. § 1409(a) because the Motion was filed in the court where this case is pending.

## IV.  DISCUSSION

Upon the filing of the Debtor's chapter 11 petition, an automatic stay became effective.  *See* § 362(a).  Among other things, the automatic stay applies to:

> the commencement or continuation, including the issuance or employment of process, of a judicial, administrative, or other action or proceeding against the debtor that was or could have been commenced before the commencement of the case under this title, or to recover a claim against the debtor that arose before the commencement of the case under this title[.]

§ 362(a)(1).  The stay also applies to any acts "to obtain possession of property of the estate." § 362(a)(3).

The Bankruptcy Code authorizes the Court to, upon request and after notice and a hearing, grant relief from the stay.  § 362(d).  The requesting party has the burden of proof on the issue of the debtor's equity in the property.  § 362(g)(1).  The opposing party has the burden of proof on all other issues, including the existence of adequate protection and that the property is necessary to an effective reorganization.  § 362(g)(2).

### A.  § 362(d)(1): Lack of Adequate Protection as Cause for Relief

The first ground for relief is "for cause, including the lack of adequate protection of an interest in property of … [a] party in interest." § 362(d)(1).  The "interest in property" protected by § 362(d)(1) does not include a secured party's right to immediate foreclosure.  *United Sav. Ass'n of Tex. v. Timbers of Inwood Forest Assocs., Ltd.*, 484 U.S. 365, 371 (1988).  Lack of adequate protection may result from a diminution in value of the subject property due to depreciation or to physical loss or damage.

The Bank contends that its interest in the Main Property is not adequately protected because the Bank has no "equity cushion."  An equity cushion is "the value in the property, above the amount owed to the creditor with a secured claim, that will shield that interest from loss due to any decrease in the value of the property during time the automatic stay remains in effect." *Pistole v. Mellor (In re Mellor)*, 734 F.2d 1396, 1400 n.2 (9th Cir. 1984) (citing *Pa. State Emp. Ret. Fund v. Roane (In re Roane)*, 8 B.R. 997 (Bankr. E.D. Pa.), *aff'd*, 14 B.R. 542 (E.D. Pa. 1981)).  The existence of an equity cushion is "is the classic form of protection for a secured debt justifying the restraint of lien enforcement by a bankruptcy court." *Id.* at 1400.

**1.        The Value of the Bank's Collateral**

Here, the Debtor bears the burden of establishing that adequate protection exists to protect the Bank's interest in its collateral, i.e., the Main Property and the Materials.  *See* § 362(g)(2).  Each side offered a certified real estate appraiser to provide an opinion of value for the Main Property.  The Bank offered the testimony of Michael Frauenthal of Michael Frauenthal & Associates, Inc., which was supported by a written appraisal report.  *See* Ex. 11 (the "Frauenthal Appraisal").[6]   The Debtor offered the testimony of Joy Kwong of Colliers Valuation & Advisory Services, which also was supported by a written appraisal report.  *See* Ex. M (the "Kwong Appraisal").[7]  At the evidentiary hearing, the Court had the opportunity to observe the live testimony of both witnesses and assess their credibility.  Based on that testimony—in addition to their declaration testimony—the Court finds that (i) both witnesses were qualified to provide the expert testimony they offered, (ii) their testimony was credible, and (iii) their methods and assumptions were generally reasonable and appropriate.

Both appraisers generally agreed the proper methodologies to determine the value the project was to assess it using each of the so-called "income" and "sales comparison" methods.[8]  Utilizing these approaches, each appraiser developed three opinions of value: (i) an "as-is" value for the project (which currently is under construction and incomplete), (ii) a prospective market value of the project, assuming completion of construction, and (iii) a prospective market value assuming the project is leased to a stabilized occupancy.  As a general matter, both appraisers determined the value upon stabilization of occupancy first.  They then used that value to derive the value upon completion, i.e., adjusting the stabilized value downward to reflect the time and cost of leasing out the premises.  Thereafter, both appraisers used the value upon completion to derive an as-is value, i.e., adjusting the completion value downward to reflect the time and cost of finishing construction of the project.

---

[6] The Frauenthal Appraisal was co-authored by Frauenthal and his associate, Nick Walker.  Ex. 11 at 4.

[7] At trial, the Bank objected to the admission of the Kwong Appraisal and the Court deferred its ruling until the time of this decision.  *See* Dkt. 115; Feb. 18 Tr. at 110–11.  The Court now overrules this objection for the same reasons it denied the Bank's objection to the consideration of Kwong's testimony. *See* Feb. 17 Tr. at 32–35.

[8] The Kwong Appraisal also considered the cost of replacement methodology but appears to have given it little weight and Kwong did not focus on this approach in her live testimony.  *See* Ex. M at 00178–81.

The appraisers' opinions of value for the Main Property are summarized below:

| FRAUENTHAL APPRAISAL | | |
|---|---|---|
| Type | Date of Value | Amount |
| As-is | February 28, 2025 | $22,180,000 |
| Value Upon Completion | May 31, 2026 | $39,600,000 |
| Value Upon Stabilization | May 31, 2027 | $44,720,000 |
| KWONG APPRAISAL | | |
| Type | Date of Value | Amount |
| As-is | January 21, 2026 | $41,600,000 |
| Value Upon Completion | April 1, 2027 | $61,340,000 |
| Value Upon Stabilization | October 1, 2027 | $65,600,000 |

As the foregoing chart demonstrates, both appraisers used the same overall approaches but reached substantially different conclusions of value. For instance, at various points in their analyses, each appraiser looked to different properties as "comparables" and made different adjustments to the data derived from those comparables to assess the value of the as yet unfinished Main Property— whether it was to assess prospective market rents for the residential and commercial spaces at the project, or to assess a prospective sales price for the project. Likewise, when translating the prospective income of the Main Property into a prospective market value, each appraiser determined that a different capitalization rate should be applied to the residential portion of the project (the largest source of income): 5.25% by Frauenthal and 4.75% by Kwong.[9]

These variables, and others, account for significant differences in the appraisers' conclusions of value. The Court, however, is not persuaded that the appraisers' differences in professional judgment were unreasonable. To the contrary, the Court is reminded that appraising real property is as much an art as it is a science. Two appraisers, using accepted methods, and making reasonable assumptions, can look at the same property and reach significantly different conclusions of value. The Court is not

---

[9] The Court also notes the appraisers took different approaches to the application of capitalization rates. Unlike Frauenthal, Kwong applied different capitalization rates to the other sources of income (e.g., the commercial space, digital signage, etc.). Frauenthal used a single capitalization rate for all income derived from this real estate project.

persuaded that either appraiser is necessarily "wrong," or that either appraisal is so far superior that the other appraisal ought to be disregarded.

### a.      Issues with the Frauenthal Appraisal

This is not to say that the Court agrees with *every* assumption or calculation made by each appraiser.  For instance, in generating a value based on the so-called "income approach," Mr. Frauenthal testified to his assumption that all residential units, commercial units and the common space at the project would be billed directly for their utility usage, rather than the landlord advancing those charges and collecting reimbursement from the building tenants.[10]  Based on this assumption, Mr. Frauenthal's calculation of net operating income does not include any reimbursement income.  *See Trial Ex.* 11 at 110.  However, his projection of net operating income *does* show utility expenses for residential and retail spaces being deducted from the project's overall monthly income.  This is internally inconsistent.  If utility services are billed directly to tenants by the utility providers, those billings should not be shown as an expense.  This inconsistency reduces the net operating income projection and, as a result, the estimated value of the project.  The Kwong Appraisal does not make this error.[11]

Another example is the amount of income projected for rental of the project's rooftop event space.  The Bank offered into evidence a five-year lease signed by the prospective tenant for that space showing an initial base rent of $32,230 per month, with annual escalations thereafter.  Mr. Frauenthal's calculations, however, assumed only $22,917 per month.  *See* Ex. 11 at 0104; Feb. 17 Tr. at 102–03.  Whatever the reason for the discrepancy, the Court is persuaded that the signed lease provides the most reliable indication of the rent that can be realized for that space.  Kwong used the correct amount.  *See* Ex. M at 00133.  Frauenthal's use of an incorrect number resulted in a substantially lower net operating income and a lower income-based valuation of the subject property.

---

[10] At the evidentiary hearing, the parties referred to such a cost recovery system as "RUBS," "Resident Utility Billing System" or "Ratio Utility Billing System."  *See* Feb. 17 Tr. at 73:7–14, 113:9–114:24.

[11] The Kwong Appraisal assumes the Debtor will use RUBS, i.e., advancing utility expenses and collecting them from tenants.  The projection prepared by Kwong shows utility expenses being paid each month and a substantial portion of those expenses being recovered.  The key issue is not whether the Debtor will use RUBS or separate utility meters; either approach functions to recover costs.  The issue is that the projection must correctly reflect the approach adopted.  Frauenthaler's projection does not.

Finally, the Court notes the effective date of Frauenthal's as-is opinion of value is February 28, 2025, approximately eleven months before the effective date of Kwong's valuation and nearly twelve months before the evidentiary hearing was held.  The Court is puzzled why the Bank did not engage Frauenthal to update his appraisal prior to the evidentiary hearing.  A one-year-old appraisal arguably has less persuasive force than a more recent appraisal.  Without an update, the Court was left to wonder whether any of the differences between the appraisers' opinions of value are the result of changes in the marketplace, differences in analysis, or some other reason.  Ultimately, the Court is not persuaded that the effective date of the Frauenthal Appraisal renders it irrelevant, but its age did cast some doubt on whether its substantially lower as-is valuation in early 2025 was the correct value for early 2026.

### b.    Issues with the Kwong Appraisal

On the other hand, the Court takes issue with several aspects of the Kwong Appraisal.  First, the Court is not persuaded that the projection of income from leasing out the parking garage to a valet parking operator is realistic.  The Frauenthal Appraisal assumes, consistent with the comparable properties it assessed, that residential tenants of the project will be given use of a single parking space per unit, with approximately 20 additional parking spaces available for rent.  *See* Ex. 11 at 91; Feb. 17 Tr. at 64:7-14, 71:6-72:19; 111:11-112:7; 134:9-23.  The Frauenthal Appraisal projects income of only $45,000 per year from those additional parking rentals.

In contrast, the Kwong Appraisal assumes $198,000 in annual income from the parking lot.  The Kwong Appraisal assumes that the Debtor will enter into a contract with a parking company to operate the parking spaces as a valet service; the appraisal uses the Debtor's projection of income from such a contract.  *See* Feb. 18 Tr. at 140:4–143:3.  Kwong provided testimony explaining how the building was constructed with a valet set-up in mind, how the use of valet parking permits stack parking and expands capacity, why valet parking would by beneficial to operations, and why valet parking may provide a potential source of additional income.  *Id.* at 141:2–141:13.  Kwong also testified to her belief that the parking projection was "reasonable."  However, she admittedly did no independent research on how much income would likely be generated from a valet contract in this location and that she was not aware of any such contract between the Debtor and a parking operator.  *Id.* at 181:20-182:15.  Further, she

acknowledged that none of her rental unit comparables provided valet parking—free or otherwise. *Id*. at 183:23-184:15.

Although the Debtor and its principals may be confident about the project's ability to generate this kind of income through a valet contract, there is no such contract at present. This is an unfinished, mixed-use real estate project, with no track record of generating any income from leasing out its parking spaces to a valet operator. The Debtor offered no evidence that the market for such an arrangement would result in a nearly $200,000 contract, or that charging residential and commercial tenants for this service would not reduce the amount of rent that could be generated from those lease operations. Although Kwong testified that she thought the $198,000 projection for valet income seemed "reasonable," she did not persuade the Court that this opinion was as well informed as other aspects of her appraisal, which were based on extensive market research and analysis.

Likewise, the Court is not persuaded by Kwong's projections of future income from the digital billboard to be installed at the property and managed under a contract with WOW Media, Inc. ("WOW"). Kwong projects the Debtor's share of profits in the first year will total $536,000, with increases to $679,182 and $819,864 in the second and third year, respectively. By contrast, the Frauenthal Appraisal assumes only $300,000 each year.

Kwong testified that she has experience valuing digital signage assets. *See* Feb. 18 Tr. at 129:23–24; 132:1–20. The Kwong Appraisal, moreover, contains numerous statements and statistics about the growth and profitability of the digital signage industry. Ex. M at 146-147. But Kwong's testimony and appraisal report do little to persuade the Court that the income assumptions she relies upon for digital advertising are anything more than pie-in-the-sky projections provided by the Debtor. Although the contract with WOW creates a framework for how WOW will sell digital advertising, allocate expenses and share profits, it does not guarantee any particular sales volume or payment to the Debtor. Meanwhile, the evidentiary record is inadequate to demonstrate that the proposed digital signage—which is neither installed nor operating—will generate as much income as the Debtor hopes it will.

Kwong testified at trial that she "was given a WOW Media proposed budget." *See* Feb. 18 Tr. at 129:23–24; Ex. M at 146.[12] She then proceeded to (i) describe the projections and calculations in the proposed budget, (ii) explain how she discounted to present value the projected future revenues for each of three years and averaged them, (iii) explain how she applied certain adjustments to the projected revenue for anticipated expenses, and (iv) how she translated her calculation of annual digital billboard income into a component of property value (i.e., dividing by a 6% capitalization rate).

Notably absent from Kwong's testimony was anything substantiating the underlying revenue projections made by the Debtor for an asset that is not operating at the Main Property, has no track record of financial performance, and has no contractually guaranteed revenue stream. The Kwong Appraisal itself purports to provide some evidence in support of the Debtor's projection, but it is far from compelling. For instance, the appraisal mentions a building across the street from LA Live, which has earned $1 million per year from static billboards and has received a proposal suggesting "the ownership could receive[d] $3,000,000 in annual signage income." Ex. M at 147. In contrast, the Main Property is not across the street from LA Live or any major entertainment venue and has no track record securing advertising revenue. And while the Main Property is in the same neighborhood as SoFi Stadium—a major sports and entertainment venue—it is about one mile away and not across the street from that venue.

The Kwong Appraisal mentions several other digital signs, but these examples fail to persuade the Court that the Debtor's revenue projections are reasonable and achievable. The first two of these examples are located at or near the intersection of Wilshire and Western, in the Koreatown neighborhood in Los Angeles. For one, that property owner was provided a "quote" of $600,000 in annual signage revenue, inclusive of the management fee. There is no suggestion that this revenue was actually realized. In the second, the property owner apparently realizes about $618,000 in minimum guaranteed revenue. And, in the third example, a less-desirable intersection in Koreatown, the owner "projects" revenue of $682,500 in the first year of what appears to be a not-yet-functional digital sign.

---

[12] Curiously, she did not testify *who* provided it to her, but the Court infers that it came from the Debtor's management.

This testimony is simply inadequate to persuade the Court that the Main Property, to be completed at the intersection of E. Nutwood and E. Hillcrest streets in Inglewood—about 10 miles away from the intersection of Wilshire and Western—will actually generate the same level of advertising income.  The principals of the Debtor certainly hope it will and they have made a financial bet on it.  But they have also defaulted on the Loan and run out of capital to complete the project.  Under all of these circumstances, the Court simply does not believe the Debtor's projections of digital revenue or the very substantial portion of market value attributed to the entire project on account of those revenue projections.

Finally, the Court is not persuaded that the Main Property will generate approximately $107,000 in annual revenue from leasing the gym to a gym operator.  There is no evidence that such a contract exists or that there is demand for such space in that neighborhood.  As Frauenthal testified, "all the competitive apartment projects in the area, and in the expanded area, have gymnasiums included, or workout areas for the tenants, so that's included in the rent…" *See* Feb. 18 Tr. at 72:23–73:6.  As a consequence, the Frauenthal Appraisal did not treat the gym as an income producing feature of the property.  The Court found this testimony persuasive and heard nothing from Kwong (or any other witness) to persuade the Court otherwise.  Of course, this is not to say that the Debtor will never monetize the gym in this way.  It is *possible* that the Debtor will find a party willing to pay rent for the gym space *and* permit apartment residents to use the facility without additional cost.  But the Court is not convinced on this evidentiary record that the marketplace would necessarily ascribe value to the project on account of this concept.

### c.      The Court's Determination

For all the foregoing reasons, the Court concludes that the Frauenthal Appraisal concludes to a value that is too low, and the Kwong Appraisal concludes to a value that is too high.  The Court is firmly convinced that the as-is fair market value of the Main Property is squarely between the two. Specifically, the Court determines that the as-is value of the Main Property, as of the date on which the evidentiary hearing concluded, February 19, 2026, is the mean, or average, of the two opinions of value: **$31,890,000** (i.e., equal to the sum of $22,180,000 and $41,600,000, divided by 2).  No party offered testimony that the value has been fluctuating, is unstable or is deteriorating over time, so the Court finds

16

that the Main Property's value is stable.  For these reasons, the Court also finds that the as-is value of the Main Property was $31,890,000 *as of the Petition Date*.

Also, the Court rejects the Debtor's argument that there is additional value securing the Bank's claim in the form of the Materials, which the Debtor values in excess of $5,000,000.  This would not be appropriate because both appraisers derived their as-is values by subtracting the cost to complete the project from their estimated value upon completion.  In other words, the value of the Main Property when completed will necessarily include all of the raw materials and appliances.  The value of the Materials is baked into both appraisals.  Further, the Court received no evidence suggesting that the appraisers' estimates of the costs to complete the Main Property included the cost to acquire the Materials—because the Debtor had already acquired them.  If the Court treated these as an additional form of collateral securing the Loan, the Court effectively would be crediting the value of that collateral twice.

### 2.    The Amount Owed to the Bank

The Bank's claim is not subject to any pending objection and is deemed allowed under Bankruptcy Code section 502(a).  On the Petition Date, the Bank's claim was slightly oversecured, i.e., a claim of $31,238,526.60 secured by the Main Property, valued at $31,890,000.   Thus, the Bank has been accruing interest on its claim pursuant to Bankruptcy Code section 506(b).  Using the Bank's per diem interest figure of $7,330, the Court calculates the Bank's claim as of the date on which the evidentiary hearing concluded, February 19, 2026, as follows:

| Date | Days Elapsed | Postpetition Interest | Claim Balance |
|---|---|---|---|
| 8/13/2025 | 0 | $0 | $31,238,526.60 |
| 2/19/2026 | 190 | $1,392,700.00 | **$32,631,226.60** |

*See* Feb. 18 Tr. at 58.

17

**3.      No Equity Cushion Exists to Protect the Bank's Interest in the Main Property**

Because the Court finds that the Main Property is worth $31,890,000 as of February 19, 2026, the Bank's claim is now undersecured.  In other words, the Court finds that, as of February 19, 2026, no equity cushion exists to protect the Bank's interest in the Main Property.

In addition to the lack of an equity cushion, the Debtor apparently lacks any ability to make monthly adequate protection payments.  The Debtor's only cash flow is a meager $3,634.61 per month from the lease of a portion of the Main Property's roof to T-Mobile.  The Debtor has been using all of that cash flow to pay for its operating expenses.  *See* Dkt. 75 at 29 (cash collateral budget); Dkt. 94 (order approving budget); Dkt. 138 (monthly operating report for Feb. 2026).  As noted above, the Debtor's authorization to use the Bank's cash collateral to pay its operating expenses expired on February 28, 2026, and no party has filed papers regarding the Debtor's use of cash collateral since then.

Given the lack of equity cushion, and the Debtor's apparent inability to make monthly adequate protection payments, the Court finds that cause exists to lift the automatic stay under section 362(d)(1).

**B.      § 362(d)(2): Lack of Equity in Property Unnecessary to Effective Reorganization**

The Bankruptcy Code provides that the Court "shall" grant relief from the stay of an act against property if the debtor has no equity in the property and the property is not necessary for an effective reorganization.  § 362(d)(2).  The two elements are stated conjunctively and both must be satisfied to obtain relief from the stay in a chapter 11 case.

**1.      Lack of Equity**

"Equity" in section 362(d)(2)(A) "refers to the difference between the value of the property and all encumbrances upon it." *Stewart v. Gurley*, 745 F.2d 1194, 1195 (9th Cir. 1984).  That is, the court takes into account liens junior to the movant's.  The movant has the burden of establishing the debtor's lack of equity in the property.  § 362(g)(1).

As of February 19, 2026, the Court calculates the amount of liens encumbering the Main Property as follows:

| Lien | Amount on Petition Date | Source |
|---|---|---|
| Tax lien of the Los Angeles County Tax Collector | at least $457,061.18 | Claim No. 11-1; Exs. 7, 26 and 27 |

| | | |
|---|---|---|
| First-priority consensual lien of Royal Business Bank, recorded on August 6, 2021 | $32,631,226.60 | Claim No. 8-1; Trial testimony |
| Consensual lien of Forbix Capital | $4,500,000.00 | Dkt. 18 at 7 |
| Mechanic's lien of PRL Glass Systems, Inc., recorded on April 1, 2025 | $32,389.49 | Claim No. 6-1 |
| Mechanic's lien of Parry Construction Inc., recorded on May 29, 2025 | $575,167.82 | Claim No. 17-1 |
| Mechanic's lien of Emerald Aire, Inc., recorded on May 30, 2025 | $214,343.37 | Claim No. 5-1 |
| Mechanic's lien of Best Choice Plumbing & Repair Inc., recorded on July 8, 2025 | $217,860.76 | Claim No. 4-1 |
| Sum: | $38,628,049.22 | |

As set forth in Section IV.A.1.c above, the Court determines that the value of the Main Property is $31,890,000.  Therefore, the Bank has met its burden of establishing the Debtor's lack of equity in the Main Property.

### 2.    Property Unnecessary to Effective Reorganization

On the second element for relief from the stay under section 362(d)(2), the debtor must prove that the "property is … necessary to an effective reorganization."  § 362(d)(2)(B).  In *Timbers*, the Supreme Court addressed this provision's meaning:

> What this requires is not merely a showing that if there is conceivably to be an effective reorganization, this property will be needed for it; but that the property is essential for an effective reorganization *that is in prospect.*  This means … that there must be a reasonable possibility of a successful reorganization within a reasonable time.

484 U.S. at 375–76.  (internal citations and quotations omitted).  The Supreme Court further acknowledged that the debtor's burden on this issue is a moving target:

> The cases are numerous in which § 362(d)(2) relief has been provided within less than a year from the filing of the bankruptcy petition.  And while the bankruptcy courts demand less detailed showings during the four months in which the debtor is given the exclusive right to put together a plan, see 11 U.S.C. §§ 1121(b), (c)(2), even within that period lack of any realistic prospect of effective reorganization will require § 362(d)(2) relief.

*Id*. at 376.  (internal citations and footnotes omitted).

The Bankruptcy Appellate Panel of the Ninth Circuit has offered even greater clarity regarding the debtor's burden on this issue at various stages of a chapter 11 case:

| Stage of Case | Debtor must demonstrate that a successful reorganization with a reasonable time is... |
|---|---|
| 1. Early | "plausible" |
| 2. Near expiration of the debtor's exclusive period to file a plan under § 1121(b) | "probable" |
| 3. After expiration of the debtor's exclusive period to file a plan under § 1121(b) | "assured" |

*Sun Valley Newspapers, Inc. v. Sun World Corp. (In re Sun Valley Newspapers, Inc.)*, 171 B.R. 71, 75 (B.A.P. 9th Cir. 1994) (citing *Sumitomo Tr. & Banking Co. v. Holly's, Inc. (In re Holly's, Inc.)*, 140 B.R. 643, 700–02 (Bankr. W.D. Mich. 1992)).

The Debtor's case is well into the third stage. The Debtor's exclusive period to file a plan expired on December 11, 2025. *See* § 1121(b); Fed. R. Bankr. P. 9006(a)(1) (setting forth rules for computing time period stated in days). The deadline to file proofs of claim was December 12, 2025. Dkt. 43. On December 11, 2025, the Court entered an order setting a deadline of February 6, 2026, for the Debtor to file an initial chapter 11 plan and disclosure statement. Dkt. 67. On February 5, 2026, the Court entered an order extending that deadline for to March 9, 2026. Dkt. 109. On March 10, 2026, the Court entered an order to show cause why the Debtor's case should not be dismissed or converted for, among other reasons, failure to timely file an initial chapter 11 plan and disclosure statement. Dkt. 134 (the "OSC"). The Clerk of Court served the OSC on Mr. Aver, the Debtor's counsel, via email shortly after 3:17 p.m. *Id*. at 5 (proof of service). In the week following the issuance of the OSC, and despite the Debtor having known the universe of claims in this case for more than 90 days, the Debtor *still* has not filed an initial chapter 11 plan and disclosure statement.

The testimony at trial was inadequate to meet the Debtor's burden. In early May of 2025—approximately 10 months ago—the Debtor executed a listing agreement with Colliers to market the Main Property for sale or investment. Feb. 19 Tr. at 95:19-22. The Debtor has twice executed extensions of that listing agreement and it has been active at all times since its original execution. *Id*. at 96. At the evidentiary hearing, Khodorkovsky testified:

20

Postpetition..., the brokers that we hired from Colliers have taken a very aggressive approach to market it far [and wide].  And prepetition, the issue we're having is that because there was a looming foreclosure on the [Main P]roperty, that we just couldn't get certain people to the table.  I think postpetition, we were able to have a lot more showings, a lot more people coming to the property to see if they want to invest and to buy.

Given the fact that we had November, which was a little bit slow due to holidays, and December is pretty rough, I think they've had three solid good months of activity, and it's been renewed in January and February substantially.  So that's what ... we've been working on post petition and trying to raise cash [too], of course, make sure everybody gets paid.

*Id*. at 48; *see also id*. at 90-91 (Massie testifying the same).  Massie testified that he'd spoken to "[w]ell over 30" prospective buyers, developers or equity investors.  *Id*. at 91:9-15.

Khodorkovsky testified that the Debtor had received two offers postpetition, neither of which was binding.  *Id*. at 51, 78.  The first offer was received "[a] few months ago," whereby the offeror would advance $25 million, the Bank would advance "some money," and Forbix would subordinate its junior lien in the Main Property.  *Id*. at 73–75.  The second offer was received on Monday, February 16, 2026, and concerned an equity investment of $16.5 million, "with [the Bank]'s involvement" "to finish the project ... and make everybody whole."  *Id*. at 75–78.  Khodorkovsky acknowledged, however, that the Bank had not consented to either offer, and that its consent was a condition precedent to the offer being of any value.  *Id*. at 78, 81:20-21.

Khodorkovsky and Massie both testified that the Debtor is expecting more offers because Khodorkovksy had "received indication from certain parties verbally" toured the Main Property.  *Id*. at 51, 78:24-25, 92:2-4.  But the Court is not persuaded.  After 10 months of marketing—approximately 6 of which were under the protection of the chapter 11 process—the Debtor has been unable to locate the capital necessary to complete the project or a buyer to facilitate an orderly liquidation.  At this point, the Court finds that the prospects of a feasible reorganization in a reasonable amount of time are dim—at best.  The Court finds that the Debtor has now had a reasonable time to effectuate a reorganization and failed to do so.  Under any of the standards described in *In re Sun Valley Newspapers, Inc.,* but most assuredly under the standard applicable in this late stage of the case, the Debtor has failed to meet its burden of proof under Bankruptcy Code section 362(d)(2)(B).

Accordingly, the Court will grant relief from the automatic stay under Bankruptcy Code section 362(d)(2).

## V.   CONCLUSION

For the reasons set forth above, the Court will grant the Motion under sections 362(d)(1) and (d)(2).  In its discretion, the Court declines the Bank's request for waiver of the 14-day stay provided in Rule 4001(a)(4) of the Federal Rules of Bankruptcy Procedure.  The Court will separately enter an order in accordance with the foregoing.

# # #

Date: March 18, 2026

Martin R Barash
United States Bankruptcy Judge

22